**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CHAI CENTER FOR LIVING JUDAISM, INC., and RIVKAH BOGOMILSKY, <br><br> Plaintiffs, <br><br> v. <br><br> TOWNSHIP OF MILLBURN, NEW JERSEY, and TOWNSHIP OF MILLBURN, NEW JERSEY ZONING BOARD OF ADJUSTMENT <br><br> Defendants. | Case No. <br><br><br> **COMPLAINT** |

**COMPLAINT**

Plaintiffs CHAI CENTER FOR LIVING JUDAISM, INC., and RIVKAH BOGOMILSKY, by their attorneys Storzer & Associates, P.C., hereby complain of Defendants TOWNSHIP OF MILLBURN, NEW JERSEY (the "Township"), and TOWNSHIP OF MILLBURN, NEW JERSEY ZONING BOARD OF ADJUSTMENT (the "ZBA") (collectively, the Township and ZBA shall be referred to as "Defendants") as follows:

**INTRODUCTION**

1.     This action is commenced by Plaintiffs to redress violations of civil rights, as protected by the Free Exercise Clause of the First Amendment and Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, and the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc, *et seq.* ("RLUIPA"), caused by the Defendants' burdensome, discriminatory and unreasonable land use regulations and intentional conduct that have prohibited and continue to prohibit the Plaintiffs from using real

1

property as a house of worship on three parcels located at 437-439 Millburn Avenue in Millburn Township, New Jersey.

2.      Plaintiffs applied for conditional use and bulk variances and preliminary and final site plan approval to the ZBA to use 437-439 Millburn Avenue in Millburn Township, New Jersey as a house of worship, which was denied by the ZBA following months of testimony and evidence submitted by Plaintiffs on the erroneous legal basis of *res judicata*.

3.      Defendants have intentionally targeted Plaintiffs' religious exercise within the Township, enforcing its unconstitutional zoning ordinance in an effort to frustrate Plaintiffs' attempts to engage in Orthodox Jewish prayer.

4.      The Defendants' actions have prevented Plaintiffs from engaging in their religious exercise by building their synagogue, which would allow Chai Center to provide and to expand its religious programming and free it from the onerous conditions under which it now operates out of its Rabbi's home.

## PARTIES

5.      Plaintiff CHAI CENTER FOR LIVING JUDAISM, INC. ("Chai Center") is a tax-exempt nonstock corporation formed under the laws of the State of New Jersey on September 4, 1992.

6.      Plaintiff RIVKAH BOGOMILSKY is a citizen of the State of New Jersey with an address of 1 Jefferson Avenue, Short Hills, New Jersey 07078.

7.      Defendant TOWNSHIP OF MILLBURN, NEW JERSEY ("Township") is a municipal corporation of the State of New Jersey, having offices at 375 Millburn Avenue in the Township of Millburn, in the State of New Jersey.

8.      Defendant TOWNSHIP OF MILLBURN, NEW JERSEY ZONING BOARD OF

2

ADJUSTMENT ("ZBA") is a municipal agency organized pursuant to N.J.S.A. 40:55D-69 with its principal place of business at 375 Millburn Avenue in the Township of Millburn, in the State of New Jersey.

9.　　Plaintiff Chai Center is a religious assembly or institution, as that term is used in 42 U.S.C. § 2000cc(b)(1).

10.　　Each of these Defendants is a "government" within the meaning of 42 U.S.C. § 2000cc-5(4)(A).

## JURISDICTION AND VENUE

11.　　The subject matter jurisdiction of this Court is founded upon 28 U.S.C. § 1331 (federal question jurisdiction) in that this action is brought under 42 U.S.C. §§ 2000cc, *et seq.*, and 42 U.S.C. § 1983.  This Court also has supplemental jurisdiction over Count VII under 28 U.S.C. § 1367(a) for Plaintiffs' claim brought under New Jersey law.

12.　　Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) in that all of the events giving rise to the claims herein occurred in this district and the Defendants are subject to personal jurisdiction in this district as of the commencement of this action.

## FACTUAL ALLEGATIONS

### The Burden Imposed on Plaintiffs' Religious Practices

13.　　In 1992, Rabbi Mendel Bogomilsky and Plaintiff Rivkah Bogomilsky ("Bogomilskys") moved to the Township of Millburn at 437 Millburn Avenue.

14.　　The Chai Center grew out of a home prayer meeting group that had been meeting in other homes in Millburn since about 1985, and was incorporated in 1992.

15.　　Prayer services moved to the Bogomilskys' home in or about 1993.

16.     Since 1993, and without a permanent synagogue, the Chai Center has operated out of the Bogomilskys' home.

17.     The Chai Center was founded for the purpose of providing community outreach dedicated to the conduct of Orthodox Judaism, cultural activities connected with Jewish Holidays throughout the year, and to conduct classes in Jewish Ritual and Philosophy free of charge.

18.     The Chai Center is affiliated with the Chabad-Lubavitch Movement of Orthodox Judaism.

19.     Chabad-Lubavitch is a major movement within mainstream Jewish tradition with its roots in the Chassidic movement of the 18th century.   The Chabad-Lubavitch branch of Chassidism was founded in or around 1788.  Today, Chabad-Lubavitch operates 3,500 locations in more than 85 countries.

20.     The word  "Chabad"  is  a  Hebrew  acronym  for the three intellectual  faculties of *chochmah* -- wisdom, *binah* -- comprehension, and *da'at* -- knowledge.

21.      The word "Lubavitch" is the name of the town in Russia where the movement  was originally based.  The leadership of the Chabad movement was forced to move to Rostov in 1914 because of the events of the First World War, and then later to Leningrad.

22.     Chabad-Lubavitch teaches that all Jews, regardless of their Jewish knowledge and practices, contain a divine spark.  By welcoming all Jews into centers of Jewish practice and learning, Chabad-Lubavitch seeks to repair divisions between observant and non-observant Jews.

23.     Chabad is a unique religious organization, and its motto is love your fellow as yourself.  Plaintiffs believe that every single individual has a spark of goodness within them and they, therefore, believe and teach the importance of love and respect for each and every one of G-d Almighty's creations.

24.     Plaintiffs share these religious beliefs described above.

25.     Plaintiffs seek to bring the teachings of Judaism to those who may be interested in learning about it in a nonjudgmental and non-imposing manner to each person at their own pace.

26.     Many aspects of Jewish religious observance, such as the building of Sukkahs during the Jewish festival of Sukkot, within which all meals must be eaten for eight days, the weekly observance of Shabbat including eating the mandatory three meals during the day, the observance of Passover and related dietary laws, are based in the home.

27.     It is understood within Jewish cultural and religious practice that the observance of religious holidays in the home does not transform the home into a synagogue.

28.     Rather, religious home observance is guided by the Jewish value of *hakhnasat orchim*, or "hospitality to guests."

29.     Education, of both children and adults, is part of the Chai Center's religious mission.

30.     Plaintiffs believe that they must educate Jewish children in the customs and practice of their religion, as well as to prepare them for the responsibilities of a Jewish adult.

31.     The practice of Orthodox Judaism also requires daily prayer observance.

32.     This daily prayer observance includes a daily schedule of three sets of prayers: (a) *shacharis*, early in the morning; (b) *mincha*, between early afternoon and subset; and (c) *maariv*, after nightfall.  All of these are obligatory, whether one has the opportunity to pray communally or not.

33.     Communal prayer in the Jewish faith requires a *minyan*, or quorum of at least ten adult males over the age of 13, but does not necessitate that the prayer be in a formal or permanent setting such as a synagogue.

34.     Certain crucial components of the Jewish prayer services may only be said in an assembly of the cited quorum.  These include, but are not limited to, reading from the Torah scroll (mandated for Saturday morning, Saturday afternoon, Mondays, Thursdays and on religious holidays) and the recital of the *Kaddish* or doxology which is inserted at certain parts of the daily prayers and is also said by mourners following the death of a parent or other close relative.

35.     Under Orthodox Jewish law, one is duty bound to assemble a quorum and partake in communal prayer (as opposed to praying alone) whenever it is possible to do so. This obligation is driven, in part, by the fact that some of the most important components of the prayer services (discussed above) are exclusive to communal prayer.

36.     Jewish religious observance permits prayer in a private home. Engaging in communal prayer in a private dwelling does not transform the private dwelling into a synagogue.

37.     On Shabbat and on certain Jewish holidays, Orthodox Jewish law prohibits operating or riding in an automobile.

38.     On these days, the location for prayer must be within reasonable walking distance of the attendees' residences.

39.     There is no Orthodox Jewish Synagogue within the Township.

40.     Like many Chabad-affiliated organizations, the Chai Center does not have formal membership.

41.     For approximately the last 10 years, however, the Chai Center's congregation has been consistently composed of about 100 families.

42.     The Chai Center currently operates out of the Bogomilskys' home, and holds religious services during the week on Monday and Thursday from approximately 7:30 a.m. to 8:30 a.m.  Similar services conducted prior to the COVID pandemic attracted about 10 people per

service.

43.     The Chai Center also conducts services on Sunday mornings for one half hour, and then a Sunday school for approximately 20 children for three hours.

44.     On Saturday mornings, the Chai Center conducts worship services for approximately 35 people.  As is typical for Jewish congregations, the arrival and departure times for the congregation are staggered.

45.     In addition, the Chai Center conducts worship services on Jewish holidays throughout the year, averaging six or seven mornings where additional services would be held.

46.     There are also some parties associated with Jewish holidays during the year, such as Purim and Hanukkah.

47.     Operating out of the Bogomilskys' house and not a synagogue restricts and impedes the Plaintiffs' religious exercise and frustrates its religious mission in many ways.

48.     At the current location, the Hebrew School for children must operate out of the same room that is used for adult prayer, which means that all of the materials for the Hebrew School must be moved into and out of the room each week, and the current location lacks storage space for the Hebrew School's materials.

49.     Because the space is not permanent, the Sunday School is unable to hang blackboards or educational posters.

50.     The Sunday School is further unable to separate different ages of children due to space limitations.

51.     This spatial limitation also prevents Chai Center from offering childcare for toddlers during religious services, which would allow their parents to attend religious services.

52.     Chai Center also seeks to conduct youth services simultaneously with its adult

services, but cannot do so now due to spatial limitations, which means that children are not given the opportunity from a young age to learn how to attend services so that they can become full adult members after their *b'nei mitzvot*.

53.     The limitations on facilities available to the Hebrew School has caused members to leave the congregation.

54.     Chai Center is also currently limited to the home kitchen in the Bogomilskys' home for all food preparation.

55.     As a result, Chai Center cannot fully offer *kiddush* meals after services, as is customary in the Jewish tradition.

56.     Using the same room as a sanctuary and a social hall also means that families cannot decorate for *b'nei mitzvot* and they are very limited in the food that can be brought in, due to spatial limitations.

57.     Some families have also felt uncomfortable holding their childrens' *b'nei mitzvot* in a private home, which has also caused families to leave the congregation.

58.     Other attendees who have been interested in the Chai Center have not felt comfortable attending services in a private home, which has inhibited Plaintiff's growth and, therefore, prevented Chai Center's religious mission from being fully realized.

59.     Chai Center also currently has a very limited gravel parking lot, which prevents families from being able to use strollers and dissuades them from attending services.

60.     The lack of signage for the Chai Center has made it difficult for potential attendees to find the property.

61.     Spatial limitations within the current site mean that for holiday parties, such as the Purim party, Chai Center must erect tents outside.  Even so, the space is not adequate and attendees

leave because there is insufficient space.

62.     In addition, Chai Center is not permitted to conduct Rosh Hashanah or Yom Kippur services at its current location.

63.     The inability to host Rosh Hashanah or Yom Kippur services at a dedicated location has substantially burdened Plaintiffs' religious exercise.

64.     Although Chai Center has sometimes been able to rent space from a local public school for these services, it must move all of the necessary religious materials and furniture needed for the services, (including Torah scrolls, prayer books, *talit* prayer shawls, Ark, Torah reading tables called a *bima*, partitions between male and female participants called a *mechitza*, materials for the youth services and more) into the building prior to each service and then remove them immediately after the service in order to allow for the public school use of the space.

65.     Chai Center cannot access the building until after school (including after-school activities) is over, which can mean only a couple of hours before the beginning of the holiday on which no work can be performed.

66.     On at least one occasion, the need to move materials into the building before the beginning of Yom Kippur meant that the Bogomilskys were not able to eat a meal prior to the beginning of the 25-hour Yom Kippur fast.

67.     Since the public school begins the next day at about 7:00 a.m., and access to the school is only possible when a custodian is present, all items brought in by Chai Center must be removed immediately after the fast, before even going home to break the Yom Kippur fast.

68.     There is also no guarantee that the school will rent space to Chai Center in any given year, since the space is available to other groups too, and is on a first-come, first-served basis, causing uncertainty that Chai Center will be able to hold religious services at all on these

days.

69.     Chai Center's belief that it should provide opportunities for individuals to perform religiously mandated acts is at the core of its religious mission.

70.     Chai Center cannot, *inter alia*, host any event at its current location that will draw more than 15 cars at a time, other than for five times each calendar year where advance notice must be given to the Township prior to the event, which limits the religious activities that Plaintiffs can host and curtails its opportunities for outreach.

71.     Chai Center also cannot advertise any event that will be held at its current location or place any signage at its current location, which infringes on their ability to reach potential attendees and to grow.

72.     This has resulted in individuals being unable to locate the Chai Center and participate in religious programming.

73.     Due to the lack of signage, on more than one occasion, people seeking to attend a service or a religious celebration have been unable to find the Chai Center's location, especially at night after dark.

**Plaintiffs' Property**

74.     Chai Center is the owner of real property identified on the tax map of the Township as Block 1208, Lots 1 and 2, with a street address of 437 Millburn Avenue.

75.     Rivkah Bogomilsky is the owner of real property identified on the tax map of the Township as Block 1208, Lot 13, with a street address of 439 Millburn Avenue (together with 437 Millburn Avenue, "the Millburn Property").

76.     The Millburn Property is located in the "R-6" zoning district of the Township.

77.     The Millburn Property is 0.85 acres in size.

78.     The immediate neighbor to the west of the Millburn Property is the St. Stephen's Cemetery & The Chapel at Short Hills, an above-ground mausoleum.

79.     Within a half-mile radius of the Millburn Property is the Millburn High School (151 feet), an education center (367 feet), two funeral homes (0.2 mile), two hair salons (0.2 mile), a yoga center (0.2 mile), a car dealership (0.2 mile), the First Baptist Church (0.2 mile), the Mt. Zion AME Church (0.2 mile), a 62-unit multi-family apartment complex (0.2 mile), a dental practice (0.3 mile), a music center (0.3 mile), the Millburn Police Department (0.3 mile), the St. Rose of Lima Roman Catholic Church (0.3 mile), the St. Rose of Lima Academy (0.3 mile), a Chinese restaurant (0.4 mile), the Coder School (0.4 mile), a bakery (0.5 mile), a group home (0.5 mile), the Washington Elementary School (0.5 mile), and St. Stephen's Preschool (0.5 mile).

## The Township of Millburn's Land Use Regulations

80.     The use of the Millburn Property is subject to the laws and regulations of the Township and the State of New Jersey.

81.     The Township regulates zoning within its borders through its Development Regulations and Zoning Ordinance, codified at Chapter DRZ ("Development Regulations and Zoning Ordinance") of the Township's Code.

82.     The Township Code sections described herein are "land use regulations" within the meaning of 42 U.S.C. § 2000cc-5(5).

83.     Section 201 of the DRZ, entitled "Purpose," provides:

> "The purposes of this ordinance are to establish a pattern for the use of land and structures based on the Master Plan, to implement the Master Plan, and to encourage private and municipal action that will foster development of the Township in a manner which will promote the public health, safety, morals, and general welfare of the people.  This ordinance is intended to carry out the purposes set forth in the New Jersey Municipal Land Use

Law."

84.    The Township adopted a Master Plan in 1985, which was last reexamined in 2018.

85.    The 2018 reexamination states that the status of the 2008 Issues and Objectives included:

> "Ordinance #2417-13 RE: Conditional Uses of Houses of Worship, Schools in Residential Zones. This ordinance was intended to amend the provisions of the Land Development Ordinance to modify the conditions set forth for the conditional uses of schools and houses of worship in residential zones so that they are consistent with both sound planning principals [sic] and applicable case law and to also adjust the parking requirements for places of assembly, schools and houses of worship accordingly."

86.    The 2018 Master Plan Reexamination stated in part:

> "The R-6 Residential zone was specifically mentioned as having new construction out of context with the surrounding neighborhood. Participants in the Visioning Session also remarked that there were instances of overdevelopment in single-family residential zones."

87.    Section 301.27 of the DRZ defines "house of worship" as:

> "HOUSE OF WORSHIP — A church, synagogue, temple, mosque or other facility that is used for prayer and other religious observances by persons of similar beliefs and that is architecturally designed and particularly adapted for the primary use of conducting formal religious services on a regular basis."

88.    The Code does not permit a house of worship to locate anywhere within the Township's twenty (20) zoning districts by right.

89.    Section 604(b) of the DRZ provides: "Prohibited uses. . . .  b. All uses not expressly permitted in this ordinance are prohibited."

90.    Houses of worship are only permitted as conditional uses in the R-3, R-4, R-5, R-6, R-7, R-8 and CMO (Commercial Medical/Office) zoning districts.

91.    Religious land use within the Township is therefore only permitted with "conditional use" approval.

92.     Section DRZ-607 of the Township Code titled "Off-street parking and loading" sets forth requirements for off-street parking for all uses in the Code.

93.     Section DRZ-607.2 of the Township Code titled "Minimum Parking Requirements"  provides in pertinent part:

> "The number of parking spaces for each use shall be determined by the number of dwelling units, the amount of gross floor area as defined in this ordinance, or such other measure as noted.  Where a particular function contains more than one use, the minimum parking requirements shall be the sum of the component parts.  Where an expansion of an existing use takes place, the parking requirements for the entire use shall be met."

94.     Parking spaces required for houses of worship are one space per three seats within the sanctuary or worship hall, or five spaces per 1,000 square feet of gross floor area, whichever is greater.

95.     Parking spaces required for certain non-religious assembly and institutional uses in the Township include:

a.  Art Studios and galleries: one space per 800 square feet of gross floor area;

b.  Showrooms: one space per 500 square feet of gross floor area;

c.  Office and financial institutions: one space per 250 feet of gross floor area, but no less than 0.8 of a parking space for each employee or independent contractor on site at any one time;

d.  Public and private schools: two spaces per classroom for grades K-8 and three spaces per classroom for grades 9-12. There are no additional parking requirements for large portions of the building such as cafeterias, gyms and auditoriums;

e.  Restaurant: one space per three seats; and

f.  Theater: one space per three seats.

96.     The Township's Code treats Houses of Worship differently and worse than certain other non-religious assembly and institutional land uses within the Township.

97.     Section DRZ-606.2(d)(1) of the Township Code, which applies to the R-3, R-4, R-5, R-6, R-7, R-8 zones, establishes twelve (12) additional criteria for the conditional use of a house of worship as follows:

(a)     The lot shall have frontage on a primary, secondary or collector street as shown in the Circulation Element of the Master Plan.

(b)     The lot shall have a minimum area of three acres.

(c)     The lot shall have a minimum frontage of 200 feet.

(d)     The lot shall have a minimum depth of 250 feet.

(e)     Vehicular access shall be from other than a local street if the lot has frontage on more than one street.

(f)     Lot coverage shall not exceed the maximum established for the underlying Residential Zone District.

(g)     The minimum front yard setback shall be 100 feet.

(h)     The minimum side yard setback shall be 40 feet.

(i)     The minimum rear yard setback shall be 50 feet.

(j)     The minimum buffer to a residential use or zone shall be 25 feet.

(k)     The minimum parking setback shall be 20 feet.

(l)     Building height shall not exceed the maximum established for the underlying Residential Zone District.

98.     Section DRZ-606.3(d) of the Township Code, which applies to the Township's "R-7" zoning district, states: "Conditional Uses. Same as Section 606.2d."

99.     Section DRZ-606.4(d) of the Township Code, which applies to the Township's "R-8" zoning district, also states: "Conditional Uses. Same as Section 606.2d."

100.     Section DRZ-606.9(d)(1) of the Township Code, which applies to Houses of Worship in the Township's "Commercial/Medical Office" zone, establishes the following criteria for the conditional use of a house of worship as follows:

(a)     Minimum lot area: 40,000 square feet.

(b)      Minimum lot width: 200 feet.

(c)      Maximum building coverage: 40%.

(d)      Buildings shall be set back a minimum of 50 feet from any property line.

(e)      Steeples, spires, belfries, minarets and other similar building ornamentation shall be exempt from the maximum building height requirement for the CMO Zone; provided, however, that the height of such appurtenances shall not exceed 50 feet.

101.    In New Jersey, an applicant may apply to the municipality's ZBA for a "D-3" variance from conditional use requirements pursuant to the Municipal Land Use Law ("MLUL"), N.J.S.A. 40:55D-70d(3).

102.    In *Coventry Square v. Westwood Board of Adjustment*, 138 N.J. 285 (1994), the New Jersey Supreme Court held that a conditional use should be viewed as a permitted use rather than a prohibited use, as the governing body has established that the zoning district at issue is appropriate for such uses.

103.    Under New Jersey law, the applicant for a D-3 use variance must demonstrate that the proposed use meets the positive and negative criteria to support the variance request.

104.    A house of worship is considered an "inherently beneficial" use under New Jersey law, thus satisfying the "positive" criterion as a matter of law.

105.    An applicant must also satisfy the negative criteria by demonstrating that the variance can be granted without causing substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance.

106.    Because Chai Center's proposed use as a house of worship is an inherently beneficial use, the ZBA was required to conduct a four-part test set forth in *Sica v. Board of Adjustment of Twp. of Wall*, 127 N.J. 152, 162-166 (1992), to determine whether the use meets the statutory negative criteria.

107.    If the ZBA identifies any negative impacts, it must then determine whether these detrimental effects can be reduced by imposing reasonable conditions on the use.

108.    A "D" variance requires a supermajority or five affirmative votes for approval.

109.    Consideration by the ZBA of a "D" variance is an individualized assessment of the proposed use for the property involved.

110.    Section DRZ-608.5a of the Township Code contains a prohibition of disturbance of steep slope areas, except for redevelopment.

111.    Section DRZ-607.2(d) of the Township Code establishes the off-street parking requirements for houses of worship.

112.    Relief sought from the Township Code requirements for steep slope disturbance and off street parking require a bulk or "C" variance, under N.J.S.A. 40:55D-70c.

113.    In New Jersey, an applicant seeking bulk or "C" variances must apply to the municipality's ZBA for such relief.

114.    Under New Jersey law, the applicant must demonstrate that such relief satisfies the positive and negative criteria to support the variance request.

115.    A "C" variance requires a simple majority vote for approval.

116.    Section DRZ-512.2 of the Township Code requires a Design and Performance Standard relating to lighting on properties located in the R-6 Zoning District.

117.    Section DRZ-516.2 of the Township Code requires a Design and Performance Standard relating to access to loading and parking spaces, including that "Dead-end aisles shall be avoided wherever possible."

118.    Relief from a Design and Performance Standard in the Township Code requires a "waiver."

**Plaintiffs' History Within the Township of Millburn**

119.    Over the last three decades, Chai Center has sought to locate at two different locations within the Township: their personal home, by converting an existing home on certain real property, and most recently through the construction of a purpose-built facility.  The Township has aggressively frustrated each of these efforts.

120.    The Bogomilskys purchased two of the lots that comprise part of the Millburn Property in 1992 as their private home, and subsequently purchased the third lot in 1997.

121.    The Millburn Property is improved with a 2-story house at 439 Millburn Avenue and a 2.5-story house at 437 Millburn Avenue.  The third lot that comprises the Millburn Property is vacant.

122.    A site plan of the current configuration is as follows:



123.    The Bogomilskys and the Chai Center have been treated worse than other property owners by the Township, many times in response to the biases of local residents, since their arrival.

124.    In the Summer of 1994, the Bogomilskys filed a routine application with the Township of Millburn Planning Board ("Planning Board") for a reverse subdivision, seeking to consolidate lots 2 and 13 of Block 1208 which constituted the land on which their Millburn Avenue home and the vacant lot were located.  These lots had been subdivided a few years earlier by the previous owner.

125.    In late July 1994, this routine application was reviewed and internally approved by the Township Police Department, Zoning Department, Construction Department, Fire Department and Engineering Department.

126.    On July 29, 1994, two residents of 440 Millburn Avenue, who were the parents of the Traffic Bureau Commander of the Township Police Department, wrote a letter to the Planning Board objecting to the reverse subdivision on the grounds that they had "reason to believe that the premises in question [were] being used . . . as a house of worship."

127.    On September 8, 1994, and despite the Township's internal approvals of the lot merger, the Planning Board issued a resolution denying the proposed lot merger because the Bogomilskys held prayer meetings in their home.

128.    The September 8, 1994 Resolution stated that granting the lot merger "would intensify" the Bogomilskys' religious activities in the home.  The Planning Board continued that "such activities of the premises are inconsistent with the residential character of the neighborhood" and that the "Applicant's use of his home may be a conditional use pursuant to Section 606.2d of the Millburn Township Zoning Ordinance and if so, the applicant does not comply with the conditions set forth therein."

129.    In December 1994, the Bogomilskys were granted a building permit to build an extension to their home on the Millburn Avenue property.  The Bogomilsky family occupied the

Millburn Avenue house throughout the entire construction period.  The addition was completed in late Summer of 1995.

130.     On October 4, 1995, which was Yom Kippur, the holiest day of the Jewish calendar, the Township Construction Inspector and two other men acting on behalf of the Township came to the Bogomilsky home, interrupted a Yom Kippur prayer meeting, and demanded to speak to Rabbi Bogomilsky about why he had failed to obtain a certificate of occupancy for the addition.

131.     Prior to this surprise inspection, the Township did not attempt to contact the Bogomilskys regarding the certificate of occupancy.

132.     On October 13, 1995, and based on the Yom Kippur "inspection," the Township Construction Inspector Kehoe issued the Bogomilskys a violation and fine for failing to obtain a certificate of occupancy before using the addition.

133.     The Bogomilskys then made repeated requests for a final inspection and issuance of a certificate of occupancy for several years after the completion of the construction.

134.     Despite these requests, the Township did not address them until ten years later.

135.     Certificates of occupancy were finally issued in the Summer of 2005, and only after the Township issued numerous fines and further notice of violations against the Bogomilskys for occupying the addition without a certificate of occupancy.

136.     When Rabbi Bogomilsky asked the Township's Construction Inspector why he was issuing additional violations and fines in 2005, he was told that it was just a "formality," and that the certificates of occupancy could not be issued without first issuing additional violations and fines.

137.     During this time period, the Bogomilskys continued to face hostility from their neighbors.

138.    One neighbor asserted that the presence of an outdoor prayer service on the Bogomilskys' property on Rosh Hashanah in 1997 meant that they could not "allow our children to play outside."

139.    Neighbors also repeatedly asserted that the Bogomilskys were running an unlicensed daycare out of their home, even going so far as to make a complaint to the New Jersey Department of Youth and Family Services ("DYFS").

140.    DYFS came and inspected the premises and concluded that there was no basis for the claim.

### The First Millburn House of Worship Application

141.    In September 1999, the Township's Construction Inspector threatened the Bogomilskys with a violation of the Code if they continued to host prayer meetings in their home without receiving a conditional use variance from the three-acre rule contained in § 606.2(d)(1) of the Code.

142.    Although the Bogomilskys believed that their prayer meetings were permitted by law and did not require the Township's approval, they decided to accede to the Township's request to file a variance application.

143.    On February 7, 2000, the Bogomilskys filed a conditional use variance application with the Township's Planning Board to establish the Chai Center as a house of worship on the Millburn Property with a 45-seat sanctuary, Application Number 2284(a) (the "First Millburn Ave. Application").

144.    For about five months, from February through June 2000, the Bogomilskys called the Township numerous times to request that the Township's Construction Inspector certify their application as "complete" and ready for review by the Planning Board, so that the site plan could

be recommended to the ZBA.  The Bogomilskys' calls were not returned.

145.    On June 20, 2000, counsel for the Bogomilskys contacted the Township inquiring about the status of the application and when the application would be heard by the Planning Board.

146.    On September 5, 2000, the Township's Building/Zoning Official advised counsel for the Bogomilskys that their application would be scheduled for a Planning Board hearing.

147.    The First Millburn Ave. Application originally sought to maintain both of the existing single-family homes on the Millburn Property, with the Bogomilskys to reside in one and to use the other for a synagogue.

148.    The First Millburn Ave. Application sought zoning relief to: 1) combine Lots 1, 2 and 13 into one lot; 2) a variance from the three-acre requirement for a house of worship; 3) for a variance from the parking requirement to allow fewer than the statutorily required number of spaces; 4) for a variance to have two principal uses on the same lot; and 5) to have a ground sign larger than specified in the Code.

149.    At its first meeting to address the First Millburn Ave. Application, the Planning Board raised several objections to the Bogomilskys' site plan and, in February 2001, the Bogomilskys filed a revised site plan that took account of the Planning Board's objections.

150.    The revised site plan showed the planned synagogue use as follows:



151.    The revised site plan, *inter alia*, called for the demolition of one of the two-story houses, while the other would be added on to and used as a synagogue.

152.    Based on the revised site plan, the only variance that was requested by the Bogomilskys was a conditional use variance, relieving them of the three-acre rule contained in § 606.2(d)(1) of the Code, since the Millburn Avenue lot was 0.84 acres in size.

153.    On or about April 23, 2001, the Traffic Bureau Commander of the Township Police Department, and son of neighbor-objectors to the prior reverse subdivision application, wrote an eleven-page memorandum to the Planning Board detailing the Police Department's position on the First Millburn Ave. Application.

154.    The memorandum was replete with extraneous information such as the history of other houses of worship within the Town and the year, make and model of car registered to the

address as well as analysis that is outside the scope of the police department's responsibilities regarding zoning applications such that 2 of the 5 "reasons" why the Police Department objected to the First Millburn Ave. Application did not have anything to do with traffic or parking.

155.    The memorandum attempted to refute statements made in a Planning Report prepared on behalf of the Bogomilskys, repeatedly calling it "misleading."

156.    Following comments by the Planning Board on May 2, 2001, the Bogomilskys revised the application, such that they no longer required variances from the multiple principal uses on one lot, did not need a variance from the sign restrictions, and complied with the parking regulations.

157.    Importantly, one of the houses on the lot would be demolished to make a larger parking lot, and buffers would be included.

158.    On October 2, 2001, the revised site plan associated with the Bogomilskys' application was discussed before the Planning Board. At the hearing, the Township's Construction Inspector advocated that the Planning Board recommend that the ZBA deny the application because the Bogomilskys had been hosting prayer meetings "for at least the last five years that I know of."

159.    Also at the meeting, the then-Mayor criticized the Bogomilskys for proposing to build a "parking lot" in connection with the project, notwithstanding that this was required by the Zoning Ordinance.

160.    On December 12, 2001, the Planning Board voted not to recommend approval to the ZBA.

161.    The ZBA heard from the Traffic Bureau Commander of the Township Police Department, who authored the Police Department memorandum cited above, as well as another

November 29, 2001 Memorandum in which he opined that, "[t]he Chai Center still has too few parking spaces compared with other houses of worship in the Township."

162.    A Resolution memorializing the denial was approved by the ZBA on February 25, 2002.

163.    In that Resolution, the ZBA, *inter alia*, interpreted the parking requirement in light of "Code Occupancy Limit" of the proposed structure rather than either the number of individuals who regularly attend the prayer meetings or the number of seats in the proposed House of Worship building.

**Plaintiffs' Attempts to Purchase a Three-Acre Property**

164.    In an effort to avoid any further denials of a conditional use variance from the three-acre rule for "houses of worship," the Bogomilskys explored opportunities to purchase a three-acre lot in the Township that met the other requirement to be located also on a "primary, secondary and collector street."

165.    In June 2003, after gathering pledges of financial support from several backers, the Bogomilskys entered into a contract to purchase a three-acre lot located at 272 Old Short Hills Road.

166.    At the time, 272 Old Short Hills Road was one of only *six* lots in the Township that met the conditional use requirements and could reasonably be used for a "house of worship."

167.    In the fall of 2003, the then-Mayor of the Township Tom McDermott met with the sellers of a three-acre parcel that had been under contract to Rabbi Bogomilsky along with a local developer, where then-Mayor McDermott and the developer discussed potentially subdividing the property.

168.    The developer subsequently testified at deposition that he recalled then-Mayor

McDermott saying that if Rabbi Bogomilsky was to buy the property, the Township could always condemn it, and that the Township could outspend anyone in litigation costs.

169.    The developer further testified that, in discussing a potential subdivision of the property, the then-Mayor said he would take certain considerations about the subdivision "under advisement."

170.    The Bogomilskys' negotiations with the seller broke down, the property was subdivided, and the developer did build a home on the new lot that was created.

171.    On November 10, 2004, the Planning Board met to discuss a draft ordinance that included a ban on houses of worship.  The Planning Board noted the lack of availability of three-acre lots within the Township and further discussed the unconstitutionality of completely banning houses of worship within the Township.

172.    Subsequently, on December 2, 2004, the Planning Board voted to recommend the entire draft ordinance with the exception of the ban on houses of worship.

173.    The Bogomilskys additionally pursued property located at 105 Short Hills Road within the Township, but were unable to reach an agreement with the seller of that three-acre lot.

## The Jefferson Avenue Property

174.    In February 2005, the Bogomilskys purchased a property at 1 Jefferson Avenue within the Township of Millburn ("1 Jefferson").

175.    The Bogomilskys moved their family to the 1 Jefferson property.  The existing home was larger than the home on the Millburn Property.

176.    The 1 Jefferson property was approximately 1.19 acres and zoned R-3.

177.    On April 8, 2005, the Township's Construction Inspector wrote to the Bogomilskys advising that "property in the Township's residential districts may not be used for a house of

worship without compliance with the conditional use provisions of Section 606.2(d)(1) of the Township's zoning ordinance."

178.    On November 10, 2005, the Bogomilskys filed a building permit application with the Township to build an addition to their home at 1 Jefferson.

179.    On December 27, 2005, the Township's Construction Inspector denied the permit application, stating that the "submission is not consistent with the town's zoning ordinance."  He noted that the "apparent use is not permitted as it does not meet the conditional use requirements for Houses of Worship. In addition, the front yard setback does not comply with the zoning ordinance."

180.    The "use" of 1 Jefferson was, and still is, as the Bogomilskys' home.

181.    On May 15, 2006, the Bogomilskys re-filed their building permit application to build an addition to the Jefferson Avenue house.  The re-filed application addressed the front-yard setback concerns raised by the Construction Inspector in his December 27, 2005 building permit denial.

182.    Between July and September 2006, the Bogomilskys' re-filed building permit application was reviewed by Township officials and internally approved by the Township's zoning, electric, fire, building and plumbing inspectors.

183.    In October 2006, the Township's Zoning Official wrote to Rabbi Bogomilsky regarding the re-filed building permit application.  Notwithstanding the approvals given by the zoning, electric, fire, building and plumbing inspectors, the Zoning Official wrote that he was unable to determine whether the conditions of the zoning ordinance have been met.  He requested that the Bogomilskys submit detailed grading and height elevations of the property, and other numerous pieces of superfluous information regarding their building permit application.

184.    On November 13, 2006, after incurring costs of close to $1,000 to produce the requested information, the Bogomilskys submitted materials in connection with their re-filed building permit application to the Township Zoning Official.

185.    Less than a week later, on November 17, 2006, the Township Zoning Official denied the Bogomilskys' building permit.  He wrote that, "based on the scope of renovations indicated in the construction plans, statements made by the architect who prepared the plans and statements made by [Rabbi Bogomilsky] at public meetings as well as recent advertisements in publications, it is my determination that the apparent use of the new structure is not permitted because it does not meet the conditional use requirements in the R-3 residential zone."  He cited § 606.2(d)(1) of the Zoning Ordinance as the legal basis for his denial.

186.    On November 27, 2006, counsel for the Bogomilskys wrote to the Township Zoning Official advising him of relevant state and federal precedents establishing that the Bogomilskys have an absolute constitutional right to pray in their home with other members of their faith.

187.    During this time period, the Millburn Township Police Department frequently checked to determine if cars were parked at the 1 Jefferson property and the Millburn Avenue property.

188.    At least one of the checks at the 1 Jefferson property was the result of police responding to a parking complaint called in by a "Township Administrator."

189.    The Millburn Township Police Department compiled multiple "incident reports" detailing the comings and goings of individuals at the 1 Jefferson and Millburn Avenue properties.

190.    The Millburn Township Police Department also pulled and kept driving records of Rabbi Bogomilsky, Mrs. Bogomilsky, and at least one of their daughters.

**Millburn's Additional Attempted Restrictions**

191.   In October 2006, then-Mayor Daniel Baer and Township Committeewoman Sandra Haimoff attempted to amend the Township's zoning ordinances governing houses of worship by increasing the number of parking spots needed for houses of worship and imposing other onerous buffers and setback standards for houses of worship.

192.   At an October 4, 2006 meeting of the Planning Board, Chairman Michael Gorman acknowledged that the Township had not received any applications for new houses of worship in the previous seven years other than the applications submitted by the Bogomilskys.

193.   Attendees at the meeting questioned the Planning Board as to why the Township was seeking to impose more onerous restrictions on new houses of worship.  No answer was provided by the members of the Planning Board.

194.   At the October 17, 2006 Township Committee meeting, Committeewoman Ellen Steinberg asked then-Mayor Baer and Committeewoman Haimoff for the rationale behind the proposed amendments.  Mayor Baer and Committeewoman Haimoff refused to answer Committeewoman Steinberg's questions.

195.   Committeewoman Steinberg advised Mayor Baer and Committeewoman Haimoff that federal law required a compelling governmental interest to substantiate the passage of more onerous land use laws regarding houses of worship.

196.   At the same meeting, Committeewoman Steinberg stated that the 2004 effort to ban houses of worship in the Township failed on constitutional grounds.  Mayor Baer replied that the 2004 amendment did not suffer from any constitutional deficiencies.

197.   The proposed 2006 amendments to the Code governing houses of worship were not passed.

**The Prior Litigations and Settlement**

198.    On September 17, 2008, the Township Zoning Official wrote a letter to Rabbi Bogomilsky regarding the use of his Jefferson Avenue home.  Specifically, the Zoning Official stated that "[p]ortions of your residence are being used as an institutional house of worship.  In my opinion, such use and activity is qualitatively different than your use of your own home in the free exercise of religious activity, with consequential issues of traffic, parking and visual impact on the surrounding residential neighborhood. Houses of worship are only permitted in your residential zone as conditional uses. The basic condition is that the lot size be a minimum of three acres. Since your lot size does not meet the three acre minimum lot size, you are in violation of Section 606.2-d.1 of the Township Development Regulations and Ordinance. Usage of your property as a house of worship would require a variance from the Zoning Board of Adjustment for relief of the above referenced code section. Current house of worship usage must cease immediately or you will be subject to issuance of a summons requiring your appearance in a court of competent jurisdiction. As you have demonstrated a history of ignoring this office regarding similar issues on other properties, I am insisting upon an immediate cessation of the use."

199.    On or about February 5, 2009, the Township filed suit against Rabbi Mendel Bogomilsky, Rivkah Bogomilsky, the Chai Center of Millburn/Short Hills and the Shul at Short Hills in the Superior Court of New Jersey for Essex County, Chancery Division.

200.    That case was assigned the Docket Number C-30-09.

201.    The Township asserted that the Bogomilskys' prayer meetings constituted operating their home as a "house of worship" under the Code and that they must obtain a conditional use variance.

202.    On or about March 31, 2009, the Chai Center, Rabbi Mendel Bogomilsky and

Rivkah Bogomilsky filed an Answer and Counterclaim (the "Counterclaim") including, *inter alia*, violations of RLUIPA, the First and Fourteenth Amendments to the United States Constitution, a Civil Conspiracy by certain governmental officials and violation of the New Jersey State Constitution.

203.     On or about July 2009, Township and the Bogomilskys entered into a Settlement Agreement resolving the Township's suit and Counterclaim in Case No. C-30-09 (the "2009 Settlement Agreement").

204.     The 2009 Settlement Agreement also required, *inter alia*, that the Bogomilskys and the Chai Center bring an application before the ZBA for approval of 1 Jefferson to be used as a House of Worship, to merge it with a neighboring property at 7 Jefferson Avenue, and to request a conditional use variance for the approximately one-acre deficiency from the three-acre minimum lot size requirement for Houses of Worship.

205.     On December 10, 2009, in response to a list from the Township of the variances that would be needed, the Chai Center submitted their application for variance relief to the ZBA.

206.     Between April 2010 and February 2012, a total of *seventeen* public hearings were held before the ZBA, resulting ultimately in a denial of the Chai Center's application by the ZBA.

207.     In August 2012, the Chai Center filed a nine-count Prerogative Writ action, suing the ZBA for the denial, and alleging unequal treatment by the Board when compared with how the Board had treated other applications of other houses of worship asserting, two Prerogative Writ counts, three Section 1983 claims alleging Equal Protection violations, a Section 1983 claim alleging a Due Process violation, a claim under RLUIPA 42 U.S.C. § 2000cc-(b)(3)(B) "Exclusions and Limitations," a claim under RLUIPA 42 U.S.C. § 2000cc-(b)(1) "Equal Terms," a claim under RLUIPA 42 U.S.C. § 2000cc-(a) "Substantial Burdens."

208.    The Bogomilskys asserted that the Code did not define "house of worship."

209.    The Bogomilskys also asserted that the Master Plan did not show any undeveloped lots, and only four developed lots of three acres or more that were not already in use for schools or houses of worship.

210.    One of the Bogomilskys' asserted RLUIPA counts was under the Equal Terms provision, since under the Code then in effect schools were permitted on two-acre lots within residential zoning districts, but houses of worship were required to have three-acre lots.

211.    The Superior Court found in the Bogomilskys' favor as to the RLUIPA Equal Terms claim.

212.    This decision eventually culminated in a 2019 settlement agreement that established a list of prohibitions on the Bogomilskys' religious exercise in their home, and which now governs the activities at 1 Jefferson.

## The Township Amends the Zoning Ordinance

213.    In response to the Bogomilskys' Equal Terms victory, in which the Superior Court invalidated portions of the Township's Code, the Township introduced Ordinance 2417-13.

214.    Ordinance 2417-13 amended the Zoning Ordinance by, *inter alia*, increasing the amount of parking required for a house of worship in the Township from one space per three seats in the sanctuary to one space per three seats within the sanctuary or five spaces per thousand square feet with gross floor area, whichever is greater.

215.    The Ordinance also included additional changes in the requirements for Houses of Worship.

216.    Ordinance 2417-13 was adopted at the December 17, 2013 Township Committee Meeting.

**Plaintiff's Second Millburn Application**

217.   On or about July 13, 2021, Chai Center filed an application for conditional use, bulk variance, preliminary and final site plan on the Millburn Property with the ZBA (the "Second Millburn Ave. Application").

218.   The Second Millburn Ave. Application was assigned No. 3800-21 by the ZBA.

219.   Chai Center sought demolition of two existing residential dwellings and construction of a two story 12,972-square foot house of worship together with on-site parking, retaining walls, lighting, landscaping and drainage improvements.

220.   Plaintiff submitted a site plan that detailed the proposed improvements as follows:



221.   This differed from the First Millburn Ave. Application, which called for keeping

one of the existing residential dwellings to be used jointly as a synagogue and as a residence.  At that time, neighbors had objected to the use of the existing house structure in this way.

222.    The Second Millburn Ave. Application sought "D-3" conditional use variances pursuant to N.J.S.A.40:55D-70d(3) to permit the following deviations from the conditional use standards applicable to houses of worship:

      a.    Section 606.2.d.1(b) with respect to minimum lot area (three acres required and 0.85 acres proposed);

      b.    Section 606.d.1(g) with respect to minimum front yard setback (100 feet required and 69.87 feet and 40 feet proposed); and

      c.    Section 606.2.d.1(j) with respect to minimum buffer to residential (25 feet required and 7.90 feet proposed).

223.    The Second Millburn Ave. Application sought the following bulk variances:

      a.    Steep slope disturbance (1,000 square feet permitted and 6,008 square feet proposed); and

      b.    Minimum number of parking spaces provided (100 spaces required and 25 spaces proposed).

224.    The Second Millburn Ave. Application sought waivers from Section 512.2 (Lighting-Maximum foot candles permitted) and Section 516.2 (Dead end aisles shall be avoided whenever possible).

225.    The Township Police Department indicated it had no concern regarding the Application.

226.    The Township Fire Department indicated that CCLJ would be subject to routine conditions regarding Fire Department operations with no major concerns identified.

227.    The Township engineer included standard comments that could easily be addressed by the Plaintiff's engineer.

228.    The Township's planner noted that the Millburn Property "is in a transitional area of the Township, located near commercial, multifamily, and public uses."

229.    The Township planner's report did not include any indications that the Second Millburn Application could not be granted.

230.    The ZBA held hearings on the Second Millburn Ave. Application on February 7, 2022, April 18, 2022, June 20, 2022, September 19, 2022, November 21, 2022 and December 19, 2022.

231.    During the February 7, 2022 hearing, a licensed professional planner appearing on behalf of Plaintiff testified regarding: 1) the 2005 court decision that changed the standard to be used in deciding a conditional use application; 2) the changes between the First Millburn Ave. Application and Second Millburn Ave. Application including, *inter alia*, the completely new construction proposed by the Second Millburn Ave. Application versus retaining an existing structure and retrofitting it in the First Millburn Ave. Application; and, 3) the change in circumstances of the anticipated use of the property.

232.    In response to the planner's testimony, the ZBA Attorney testified that he was unsure of the standards to be applied in determining the *res judicata* issue, but that the ZBA should proceed with hearing the application.

233.    Immediately afterward, and prior to Chai Center being allowed to proceed with its presentation, the ZBA Chair allowed a neighbor to speak at length about his position on the *res judicata* issue, his experience as a Planning Board member in another municipality, to call the Second Millburn Ave. Application "absurd," all without asking a question of the applicants, even

though the Board rules prohibit such comments.

234.     The member of the public also argued that "collateral estoppel" should apply to the Second Millburn Ave. Application, referring to the 2009 litigation involving the 1 Jefferson property.

235.     The ZBA Attorney followed and quoted approvingly from this member of the public's comments with more of his own, without admonishing the member of the public, pointing out his failure to follow the rules, or clarifying to the ZBA that as a matter of law collateral estoppel cannot apply to a land use application in an administrative or quasi-judicial forum.

236.     The ZBA decided to hear testimony only on the issue of *res judicata* and whether consideration of the Second Millburn Ave. Application was barred due to the First Millburn Ave. Application.

237.     A member of the ZBA then opened up questioning of Plaintiff's planner as follows, "Okay. We are currently discussing *res judicata* collateral estoppel. I would like you to keep your comments to that and in light of [the first neighbor's] testimony already? I don't want to get repetitive. So, you know, feel free to speak, but I would like to keep it concise and on point."

238.     The next neighbor to testify did not have anything to say about the land use applications, but rather opined regarding Orthodox Jewish practice.

239.     During the next Hearing, on April 18, 2022, the ZBA Chairman summarized the Chai Center's planner's February 7, 2022 testimony as follows:

> "Okay. So we started off last time with swearing Mr. McDonough as a planner and he gave three rather philosophical answers as to why he felt that this was not *res judicata* citing two cases Sica and House of Fire with the difference of the application which seemed to have turned into the same application at the end. that was finally adjudicated upon.
>
> And, of course, COVID and its related behavioral paradigm, which as we know are decisions run with the land. So I assure you there will be some other maybe potential pandemic that comes down the road.

So, obviously, tonight we're looking for something a little bit more data driven. And I think you're onto the right path. . . .”

240.    The ZBA heard testimony from Chai Center's engineer.

241.    During this hearing, the ZBA Chair stated that public comments would only be heard at the end of Chai Center's presentation, but that questions would be permitted.

242.    The ZBA Chair allowed the first question to be from the member of the public who had spoken at length at the February 7, 2022 Hearing.  He prefaced his question as follows:

> “I'm an attorney. I've served on the Roseland Planning board for 20 years. In fact, Mr. Lanzafama has appeared before my board on more than one occasion, most recently in connection with the Gardens at Roseland.”

243.    The ZBA then allowed this neighbor to follow Chai Center's engineer's testimony with myriad comments and his own testimony that was extraneous to the *res judicata* issues, including, *inter alia,* “Actually, the decision which appears in the application package at pages, let me see, 12 through 31, after nine hearings by volunteers giving up their evenings to listen to the applicant, it was denied.  You can't merge these properties.  You can't merge the three.  And if and when you do, you're still limited to the reality of the physical space, which is the 0.84 acres when back 20 years ago and back 30 years ago, it was still a requirement in the Borough of Millburn in the R-6 zone for a house of worship to have at least 3 acres of land. Is that not correct?”

244.     His cross-examination and comments span nearly thirteen transcript pages, even after finally being admonished several times by the ZBA to stay on topic and keep his phrasing to a question.

245.    Although other members of the public were admonished to keep their “questions” to the *res judicata* issue, they frequently offered opinions on traffic, parking, and the merits of the Second Millburn Ave. Application.

246.    Beginning on June 20, 2022, the ZBA heard about the merits of the Second

Millburn Ave. Application, including the testimony of Chai Center's architect.

247.    Again, the ZBA Chair allowed the first line of questions to be proposed by the neighbor who had started the questioning the previous two times, even though the questions were laced with hostility and the neighbor had to be admonished to stay on topic.  For example, "And don't get me wrong, [Chai Center's architect], I think your plans are lovely.  You are aware of the fact, however, that the combined lots which have been declined twice by this borough twice total .84 acres, and the minimum lot size for a house of worship is 3 acres.  Yes or no?"

248.    The ZBA allowed this question to be asked of Chai Center's architect over and over by different hostile neighbors at the June 20, 2022 hearing.  For example, "3 acres. And is it correct that you are asking to build the same house of worship on a less than one-third of that, roughly .83 acres?"

249.    The ZBA also allowed neighbors to participate repeatedly at hearings, without procedural safeguards in place.

250.    The ZBA also continued to allow comments that were not questions despite admonishing the public that only questions would be allowed.

251.    On more than one occasion during the hearings on the Second Millburn Ave. Application, neighbors noted the placement of the proposed synagogue differed between the First Millburn Ave. Application and the Second Millburn Ave. Application, and that the lighting and grading were different and other differences between the site plan.

252.    During the June 20, 2022 hearing, Rabbi Bogomilsky testified at length about the proposed use of the Millburn Property, including both religious programming and the proposed design.

253.    Rabbi Bogomilsky answered numerous questions from the ZBA Chair about

parking, including stating that Chai Center would agree to alternatives such as using a parking shuttle if necessary.

254.    Rabbi Bogomilsky testified that, although Chai Center holds Bar and Bat Mitzvah religious services, they do not hold – and do not propose to hold – celebratory parties afterward.

255.    Although a number of "questions" from neighbors during the various hearings purported to be concerned with parking, Rabbi Bogomilsky's suggestion that the Chai Center would utilize the parking at the adjacent high school was met with yet more hostility.  A neighbor asked, "So you would propose – just forgive me for redirecting the question – so you would propose to hire a crossing guard to cross people illegally on Millburn Avenue where there is no crosswalk currently?"

256.    Rabbi Bogomilsky clarified that Chai Center was open to any mitigation measures that the ZBA deemed necessary.

257.    One neighbor, who clarified that he was not Jewish, asked Rabbi Bogomilsky repeatedly how Rabbi Bogomilsky knew that there were not any other Orthodox Jewish services in the Township.

258.    The ZBA allowed this line of questioning although it had nothing to do with land use impacts or the land use in question.

259.    One neighbor – who had led the questioning for each of the other witnesses – interrupted Rabbi Bogomilsky repeatedly, even after being admonished by the ZBA multiple times, but the ZBA did not stop him to allow Rabbi Bogomilsky to answer his questions, repetitive and badgering as they were.  When Rabbi Bogomilsky was able to respond to certain negative comments from this neighbor, the ZBA Chair instead cut him off.

260.    Another neighbor, immediately after being told by the ZBA that it was not the time

for public comment, opined, "[B]asically it's the Board's responsibility to make sure the sanity of the housing zone is intact.  That's my only comment."

261.    This neighbor was then permitted to ask Rabbi Bogomilsky a series of "questions" that were wholly repetitive of testimony Rabbi Bogomilsky had given at the same meeting, without any admonishment by the ZBA.

262.    These questions also did not touch on land use concerns or questions about the plan, but included, "[W]hy don't you just stay at where you are right now because that facility seems to be serving your purpose well enough, why you [sic] want to leave there?"

263.    Neither the ZBA nor its attorney stopped these questions; however, the ZBA's attorney admonished Rabbi Bogomilsky when he asked this neighbor if Chai Center conducting services at the Millburn Property the way they did in 2005 would bother the neighbor.

264.    This neighbor's final "question" was to suggest an alternative location for Chai Center to locate.

265.    On September 19, 2022, Chai Center presented the testimony of another planner, Matt Flynn, who testified regarding the substance of the Second Millburn Ave. Application and its analysis under the test for conditional variances.

266.    During this hearing, the ZBA Chair again referred to "res judicata collateral estoppel" and continued to ask questions of Chai Center's planner regarding this issue.

267.    Reasoning that, "Well, maybe he has a different view than your former planner[,]" the ZBA required Chai Center to present testimony on the "res judicata collateral estoppel" factors again.

268.    The ZBA's attorney cross-examined Chai Center's planner, asking what he had reviewed in reaching his opinion.

269.    One neighbor was concerned that the mere presence of individuals walking to and from the Chai Center would endanger her children such that she could no longer allow them to play outside.

270.    Other neighbors asked questions repeatedly, even when admonished by the ZBA Chair that the question had been answered and directed them to move on, arguing with the ZBA Chair as well as Plaintiff's witnesses.

271.    At least one neighbor improperly included comments in his "questions" for the second or third meeting in a row, without being admonished by the ZBA.

272.    Another neighbor argued that, "There was a, you know, there was a daycare that was being operated and there was an instance where, you know, either – it was either pick-up time or drop-off time where cars were just parked on Bodwell Terrace, you know, because of that it actually prevented an emergency vehicle from driving up Bodwell Terrace. I believe a fire truck could not, you know, pass through. Are you aware that such an incident occurred?"

273.    As stated previously, the allegations that a daycare was operated at the Millburn Property were proved false by a State investigation.  Further, the incident presented, without evidentiary safeguards and unrelated to Chai Center's Second Millburn Ave. Application, never occurred.  It is part of the ongoing hostility of neighbors.

274.    One neighbor asked Chai Center's planner if he considered whether the Jewish house of worship was ill-suited to be located on a street with children because a Jewish center operates on the Jewish high holidays, and since the local public schools are closed on the Jewish high holidays, the non-Jewish neighborhood children need to play in the street on those days.

275.    These questions demonstrate the lack of procedural safeguards in place for Chai Center's Second Millburn Ave. Application, and mistreatment of and hostility against the Chai

Center.

276.    Chai Center completed the presentation of the Second Millburn Ave. Application on November 21, 2022, completing the testimony of their Planner.

277.    The ZBA also heard public comments on that date.

278.    The final hearing on the Second Millburn Ave. Application was on December 19, 2022.

279.    During that hearing, the ZBA Attorney recommended that the ZBA initially deliberate and then vote on the *res judicata* issue.

280.    The ZBA unanimously voted that the Second Millburn Ave. Application was barred by *res judicata.*

**The ZBA Decision**

281.    The Second Millburn Ave. Application represented a substantial change to the First Millburn Ave. application.

282.    The ZBA Decision to deny Chai Center's Second Millburn Ave. Application discusses various substantial differences between the First and Second Applications, as noted below.

283.    The First Millburn Ave. Application proposed a dual use on the Millburn Property of a house of worship and a residence; the Second Millburn Ave. Application proposed a singular use of a house of worship.

284.    Significantly, the Second Millburn Ave. Application proposed a house of worship that would include a gathering space, kosher kitchen, coat room, storage area, sanctuary, office space, and restrooms; 1,674 square feet on the second floor including four (4) classrooms, a storage room and restrooms; and 4,323 square feet in the basement, including several classrooms, a small

reception area, mikvah, mechanical room and storage room.

285.   None of these details for the house of worship appeared in the First Millburn Application.

286.   The First Millburn Ave. Application provided for 18 parking spaces; the Second Millburn application provided for 25 parking spaces, and Rabbi Bogomilsky testified that there was an understanding with a nearby church to provide overflow parking on the High Holidays.

287.   The First Millburn Ave. Application proposed a front yard setback on Millburn Avenue of 43.72 feet; the Second Millburn Ave. Application proposed a front yard setback on Millburn Avenue of 69.87 feet.

288.   A variance had not been required for the First Millburn Ave. Application for this setback, but had been necessary for the Second Millburn Ave. Application due to the change in setback standards in the 2013 change in the law.

289.   The First Millburn Ave. Application provided a side yard setback of 39 feet on the Millburn Avenue side of the Millburn Property and a side yard setback of 55 feet on the Bodwell Terrace side of the Millburn Property; the Second Millburn Ave. Application proposed a side yard setback of 75 feet on the Millburn Avenue side of the Millburn Property and a 40-foot side yard setback on the Bodwell Terrace side of the Millburn Property.

290.   The Second Millburn Ave. Application did not seek to keep the existing residential dwellings on the property, which would have resulted in having two principal uses on the property, but instead sought to demolish the two existing residential dwellings resulting in one principal use on the property, the house of worship.

291.   The First Millburn Ave. Application proposed forty-five (45) sanctuary seats, while the Second Millburn Ave. Application proposed one hundred thirty-five (135) sanctuary seats.

292.    The First Millburn Ave. Application proposed 3,305 square feet of building coverage; the Second Millburn Ave. Application proposed 4,324 square feet of building coverage.

293.    The First Millburn Application proposed 13,594 square feet of lot coverage; the Second Millburn Application proposed 16,274 square feet of lot coverage.

294.    The placement of the driveway was altered from the First Millburn Application to the Second Millburn Application.

295.    The placement of the proposed parking spaces was altered from the First Millburn Ave. Application to the Second Millburn Ave. Application.

296.    The First Millburn Ave. Application proposed a side yard setback on Bodwell Terrace of 55 feet; the Second Millburn Ave. Application proposed a side yard setback on Bodwell Terrace of 40 feet.

297.    The First Millburn Ave. Application proposed emergency driveway access from Bodwell Terrace; the Second Millburn Ave. Application proposed none.

298.    The First Millburn Ave. Application proposed no sidewalk access from Bodwell Terrace; the Second Millburn Application proposed sidewalk access from Bodwell Terrace.

299.    The First Millburn Ave. Application proposed no steep slope disturbance; the Second Millburn application proposed a steep slope disturbance of 6,008 square feet.

300.    The First Millburn Ave. Application proposed a retaining wall along the residential property line; the Second Millburn Application proposed no retaining wall.

301.    The First Millburn Ave. Application did not address stormwater management at the Subject Property; the Second Millburn Application proposed three to four drywells.

302.    The ZBA was aware of all of these substantial changes between the First Millburn Ave. Application and the Second Millburn Ave. Application.

303.   In addition to the changes in the applications themselves, there were other substantial changes in circumstances that occurred in the twenty years between the two applications.

304.   Chai Center's planner testified to the ZBA that these changes in circumstances were significant to the consideration of the Second Millburn Application.

305.   The first substantial change was that the legal standard by which the application was to be considered had changed.

306.   Under New Jersey law, the principles of *res judicata* or collateral estoppel do not bar relitigation where, after the rendition of the judgment, subsequent events or conditions occur, thus creating a new legal situation or altering the legal rights or relation of the parties.

307.   Chai Center, as a house of worship, is what is considered as an "inherently beneficial" use under New Jersey law.

308.   At the time of the First Millburn Application, the ZBA applied the legal test for conditional use variances set forth in *Coventry Square, Inc. v. Westwood Zoning Board of Adjustment*, 138 N.J. 285 (1994).

309.   In *House of Fire Christian Church v. Zoning Board of Adjustment of City of Clifton*, 379 N.J. Super. 526, 535-39 (App. Div. 2005), the Appellate Division of the New Jersey Superior Court held that where a conditional use for an inherently beneficial use is to be considered, a ZBA must apply the legal test for a variance set forth in *Sica v. Bd. of Adjustment of Twp. of Wall*, 127 N.J. 152 (1992).

310.   The test under *Sica* is a much more relaxed standard than that under *Coventry Square*, which governs conditional use variance applications that are not inherently beneficial, in that *Sica* instructs a ZBA to presume the positive criteria, mitigate the negative criteria with

conditions if possible and then weigh them to determine whether the "variance would cause a substantial detriment to the public good . . . ." *Sica*, 127 N.J. at 166. *House of Fire* also reiterates the New Jersey Supreme Court's observation "that '[t]his balancing, '[w]hile properly making it more difficult for municipalities to exclude inherently beneficial uses . . . permits such exclusion when the negative impact of the use is significant. It also preserves the right of the municipality to impose appropriate conditions upon such uses.'"" *House of Fire*, 379 N.J. Super. at 536 (quoting *Sica, 127 N.J.* at 166 (second and third alterations in original)). In contrast, for a conditional use variance under *Coventry Square,* the underlined applicant must "show that the site will accommodate the problems associated with the use even though the proposal does not comply with the conditions the ordinance established to address those problems." *Coventry Square,* 138 N.J. at 299.

311.   The second change in circumstance was that many Chai Center congregants are now participating in religious services remotely and would not need to utilize the parking onsite.

312.   The third change in circumstance is that the neighborhood surrounding the Chai Center had undergone a significant transformation of its nature and character in the twenty years between the two applications.

313.   The Chai Center's Planner testified that the subject neighborhood had more pedestrian and vehicular activity.

314.   The Chai Center's Planner testified that the subject neighborhood was less residential in character and more accommodating to a house of worship like Chai Center.

315.   Upon information and belief, Millburn High School, which is located diagonally across from the Millburn Property had been expanded twice, in 2009 and 2018, with additions including a new three-story wing of classrooms.

316.   Upon information and belief, Millburn High School's enrollment had increased by

60% since 2001.

317.    A significant portion of the Millburn High School parking lot had been replaced with a school gym, and the athletic fields are used at a higher intensity than in 2001.

318.    Upon information and belief, a property located at 397 Millburn Avenue, 0.2 miles away from the Millburn Property, had recently been approved to be developed into approximately 50-60 residential units and 3,000 square feet of retail space.

319.    Approximately one-third of a mile from the Millburn Property on Millburn Avenue, the former location of Saks Fifth Avenue is being developed with approximately 200 housing units.

320.    A "complete streets" project was constructed on Millburn Avenue to calm traffic by removing one lane of traffic and adding bump-outs.

**The Denial of the Application**

321.    On December 19, 2022, and following five (5) hearings, the ZBA denied the Second Millburn Ave. Application as a matter of law.

322.    On February 6, 2023, the ZBA adopted a Resolution, CAL. NO. 3800-21, memorializing its denial of the Second Millburn Ave. Application.

323.    Notice of decision of the ZBA's action was published in the local newspaper on February 16, 2022.

324.    The ZBA denied the Application on the basis of *res judicata.*

325.    In so finding, the ZBA indicated:

>    The Board concludes that the doctrine of *res judicata* applies, and that the application must be dismissed on legal grounds, for all the reasons set forth above and herein, including the following:
>
>    a.    The size and scale of this project is now much larger, extensive and intense as compared to the proposal in the Previous

Application, with all of the same site plan concerns still present but with significantly increased impacts upon, and less protection for, residential neighbors.

      b.    The parking deficiency is intensified with the proposed buffer reduced;

      c.    The seating capacity is being more than doubled from the Previous Application; and

      d.    The conditions surrounding the Property have not materially changed; [sic]

326.    The ZBA held:

The Board finds for all the reasons set forth herein and above that the elements are present for the doctrine of *Res Judicata* to be applicable:

      a.    The second application is substantially similar to the first;

      b.    The same parties or their privies are involved;

      c.    There is no substantial change in the application itself given that the application significantly exacerbates the conditions and factors that caused the Board to deny the Previous Application in 2001;

      d.    There is no substantial change in the conditions surrounding the property;

      e.    There was an adjudication on the merits in the first case - and no appeal was taken from the denial of the Previous Application; and

      f.    Both applications involve the same cause of action.

327.    The ZBA also "subsequently determined by motion that it was not necessary for it to deliberate and vote on the merits of the application and the underlying variances given that the application had already been dismissed on legal grounds based on the doctrine of *res judicata.*"

328.    The First Millburn Ave. Application and Second Millburn Ave. Application were substantially different, and specifically were different on grounds relevant to the denial of the First

Millburn Ave. Application that Chai Center was able to address through its site plan, landscaping and, importantly, driveway and parking.

329.    The ZBA's holding was clearly erroneous as the First and Second Millburn Applications were substantially different.

330.    The ZBA was under no legal obligation to invoke *res judicata* in considering the Second Millburn Ave. Application before it.

**Defendants' Land Use Regulations Are Discriminatory on Their Face**

331.    On its face, the Township's Code discriminates against houses of worship and in favor of various nonreligious assembly and institutional uses by requiring more parking spaces.

332.    Five of the Township's eleven houses of worship exist on properties much smaller than three acres: Wyoming Presbyterian Church, St. Rose of Lima, B'nei Israel, First Baptist Church and Mount Zion AME Church.

333.    Following the 2012 Amendment to the Zoning Code, there is not a single conforming house of worship within Millburn with respect to the various setback requirements.

334.    In addition, other existing houses of worship have been allowed to expand with no parking requirement at all, in spite of the fact that they are not situated on three acres of land.  The Wyoming Presbyterian Church at 432 Wyoming Avenue (Block 308, Lots 1 and 22), in the R-5 zoning district, received D-3 and other variances for substantial expansion on November 15, 1993, August 18, 1997, and March 3, 2008, with no parking on site.

335.    On May 3, 2006, Congregation B'nai Jeshurun received approval to reduce parking for construction of a shed  and even though the Board acknowledged that B'nai Jeshurun did not have the statutory number of parking spaces when impermanent seating was taken into account.

336.    The ZBA's decision forecloses any ability of the Chai Center to use the Millburn

Property as a place of worship, regardless of the scale, conditions or intensity of such use.

337.   Chai Center does not have any readily available alternatives for an Orthodox Jewish Synagogue within the Township.

338.   By completely and repeatedly prohibiting Chai Center from using the Millburn Property for a house of worship, the ZBA has substantially burdened the Chai Center's religious exercise.

339.   There is no compelling or legitimate governmental interest that requires the denial of Chai Center's application.

340.   Refusing to consider Chai Center's application is not the least restrictive means of achieving any governmental interest.

341.   "Houses of worship" are similarly situated to the nonreligious assembly and institutional land uses listed above with respect to any regulatory purposes.

342.   By not permitting Houses of Worship as a permitted use by right anywhere within the Township and providing that Houses of Worship are conditional uses in only seven (7) of the zoning districts in the Township, the Township has unreasonably limited Houses of Worship.

343.   The Township and ZBA have unreasonably limited religious practice within the Township by requiring a three-acre lot size as a condition for the building of a House of Worship within the Township even though there are no unimproved three-acre lots within the residential zones where Houses of Worship are currently conditionally permitted within the Township.

344.   The Township and ZBA have unreasonably limited religious practice within the Township by enforcing this three-acre lot size as a condition for the building of a House of Worship within the Township, even though there are not any unimproved three-acre lots within the Township.

345.    The ZBA's decision was a final decision and was not reviewable by any other administrative body.

346.    Chai Center had a reasonable expectation that their use would be permitted on the Millburn Property.

347.    The ZBA's denial of Chai Center's application severely impedes and prevents Chai Center's religious exercise.

348.    The construction activity related to the Chai Center's proposed house of worship would affect interstate commerce.  The construction's effect on interstate commerce would result from, amongst other things, the Chai Center's fundraising activities related to the construction; the transfer of funds to those it engages to construct the addition; the engagement of construction companies to construct the addition; the employment of and payments to construction workers either by the Chai Center or by companies engaged by it; the purchase of necessary materials to construct the addition; the engagement of a landscaping company; the use of interstate highways for the transportation of persons and materials used to construct the addition; the use of interstate communication related to the construction of the addition; and other activities related to the construction of the addition.

349.    Chai Center's operation affects interstate commerce by or through, amongst other things, serving as a site for ongoing fundraising; its receipt of charitable donations from persons working or living outside of the State of New Jersey; the use of means of interstate communication to facilitate Chai Center's' ongoing operations; the use of interstate travel related to the Chai Center's ongoing operations; and the purchase of goods and services related to the Chai Center's ongoing operations and maintenance.

350.    The Defendants' actions described above all took place under color of state law.

351.    The harm to Chai Center caused by the Defendants' laws and actions, which prevent them from using the Millburn Property to accommodate its religious needs, is immediate and severe.

352.    Application of the Code regulations to Chai Center's proposed religious land use creates extreme expense, delay and uncertainty for Chai Center.

353.    Chai Center has also suffered significant financial damages as a result of the Defendants' laws and their application to the Chai Center.  These include the loss of donations, costs incurred pursuing the application, and rental costs incurred for replacement facilities during certain holy days.

354.    There are no quick, reliable and viable alternative options for Chai Center's operations.

355.    Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendants' wrongful laws and actions.

## COUNT I

**Religious Land Use and Institutionalized Persons Act of 2000
"Substantial Burdens"
42  U.S.C. § 2000cc(a)**

356.    Paragraphs 1 through 355 are incorporated by reference as if set forth fully herein.

357.    By denying the Second Millburn Ave. Application, Defendants have deprived and continue to deprive the Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by implementing land use regulations in a manner that places substantial burden on the Plaintiffs' religious exercise without using the least restrictive means of achieving a compelling governmental interest.

## COUNT II

**Religious Land Use and Institutionalized Persons Act of 2000**
**"Nondiscrimination"**
**42 U.S.C. § 2000cc(b)(2)**

358.    Paragraphs 1 through 357 are incorporated by reference as if set forth fully herein.

359.    By denying the Second Millburn Ave. Application, Defendants have deprived and continue to deprive the Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by implementing land use regulations in a manner that discriminates against them on the basis of religion and religious denomination.

## COUNT III

**Violation of Religious Land Use and Institutionalized Persons Act of 2000**
**"Equal terms"**
**42 U.S.C. § 2000cc(b)(1)**

360.    Paragraphs 1 through 359 are incorporated by reference as if fully set forth herein.

361.    By denying the Second Millburn Ave. Application, Defendants have deprived and continue to deprive the Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by implementing land use regulations in a manner that treats religious land uses on terms that are less than equal to nonreligious assembly and institutional land uses.

## COUNT IV

**Violation of Religious Land Use and Institutionalized Persons Act of 2000**
**42 U.S.C. § 2000cc(b)(3)(B)**
**"Exclusion and Limits": Unreasonable Limitation**

362.    Paragraphs 1 through 361 are incorporated by reference as if set forth fully herein.

363.    By denying the Second Millburn Ave. Application, Defendants have deprived and continue to deprive the Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by implementing land use regulations both on their face and as applied to Plaintiffs in a manner that unreasonably limits religious assemblies, institutions, and structures within their

jurisdiction.

## COUNT V

**United States Constitution, First Amendment**
**42 U.S.C. § 1983**
**Free Exercise of Religion**

364.    Paragraphs 1 through 363 are incorporated by reference as if set forth fully herein.

365.    By denying the Second Millburn Ave. Application, Defendants have deprived and continue to deprive the Plaintiffs of their right to free exercise of religion, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment, by substantially burdening their religious exercise without using the least restrictive means of achieving a compelling governmental interest, and by discriminating against them on the basis of religion in a manner that is not the least restrictive means of achieving a compelling governmental interest.

## COUNT VI

**United States Constitution, Fourteenth Amendment**
**42 U.S.C. § 1983**
**Equal Protection**

366.    Paragraphs 1 through 365 are incorporated by reference as if set forth fully herein.

367.    By denying the Second Millburn Ave. Application, Defendants have deprived and continue to deprive the Plaintiffs of their right to equal protection of the laws, as secured by the Fourteenth Amendment to the United States Constitution, by discriminating against them in the implementation of their land use regulations.

## COUNT VII

**Arbitrary, Capricious and Unreasonable Denial of Land Use Application**

368.    Paragraphs 1 through 367 are incorporated by reference as if set forth fully herein.

369.    Chai Center's Second Millburn Ave. Application to the ZBA sought conditional use, bulk variance, preliminary and final site plan approval for a house of worship on the Millburn Property located in the R-6 zoning district of the Township.

370.    Chai Center satisfied its burden of proof on the conditional use request and their requests for bulk variance, preliminary and final site plan approval and such relief should have been granted.

371.    The ZBA committed an error of law in applying the principle of *res judicata* and thereby dismissing the Second Millburn Ave. Application on that basis.

372.    The flaws in the ZBA's Resolution of Denial, as described herein above, and its incorrect application of the doctrine of *res judicata*, are arbitrary, capricious and unreasonable and constitute legal error as a matter of law.

373.    By reason of the actions described above, the ZBA acted in an arbitrary, capricious and unreasonable manner when it denied the Second Millburn Ave. Application as a matter of law pursuant to the doctrine of *res judicata* and said denial should therefore be reversed.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Plaintiffs respectfully request that this Court grant the following relief:

1.    A declaration that the ZBA's decision is void, invalid and unconstitutional on the ground that it violates the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and the Religious Land Use and

Institutionalized Persons Act;

2.  An order reversing the decision of the ZBA and granting the Second Millburn Ave. Application;

3.  An order directing the ZBA to grant the Second Millburn Ave. Application;

4.  Preliminary and permanent orders enjoining the Defendants, their officers, employees, agents, successors and all others acting in concert with them from applying their laws in a manner that violates the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and the Religious Land Use and Institutionalized Persons Act, or undertaking any and all action in furtherance of these acts;

5.  An award of compensatory damages against Defendants in favor of the Plaintiffs as the Court deems just for the loss of their rights under the First and Fourteenth Amendments to the United States Constitution, and the Religious Land Use and Institutionalized Persons Act incurred by the Plaintiffs and caused by the Defendants' laws and actions;

6.  An award to the Plaintiffs of full costs and attorneys' fees arising out of Defendants' actions and land use decisions and out of this litigation; and

7.  Such other and further relief as this Court may deem just and appropriate.


Dated: March 31, 2023                              **STORZER & ASSOCIATES, P.C.**

                                                   /s/ Sieglinde K. Rath
                                                   Sieglinde K. Rath (#048131991)
                                                   Samuel L. Speed, *pro hac vice admission pending*

9433 Common Brook Road, Suite 208
Owings Mills, MD 21117
rath@storzerlaw.com
speed@storzerlaw.com
Tel: 410.559.6325
Fax: 202.315.3996

*Attorneys for Plaintiffs*

## **CERTIFICATION**

Pursuant to Local Civil Rule 11.2, I hereby certify that this matter is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding, and that no such action, arbitration or administrative proceeding is contemplated at this time.  I do not know of any other party who should be joined in this action.

Dated: March 31, 2023

**STORZER & ASSOCIATES, P.C.**
/s/ Sieglinde K. Rath
Sieglinde K. Rath (#048131991)
Samuel L. Speed, *pro hac vice admission pending*
9433 Common Brook Road, Suite 208
Owings Mills, MD 21117
rath@storzerlaw.com
speed@storzerlaw.com
Tel: 410.559.6325
Fax: 202.315.3996

*Attorneys for Plaintiffs*